CHRISTOPHER J. CARNEY (DC Bar No. 472294) (*pro hac vice pending*)
Email: carneyc@sec.gov
NISHCHAY MASKAY (DC Bar No. 998983) (*pro hac vice pending*)
Email: maskayn@sec.gov
DANIEL O. BLAU (Cal. Bar No. 305008) (Local Counsel)
Email: blaud@sec.gov

*Attorneys for Plaintiff*
*Securities and Exchange Commission*
100 F St NE
Washington, DC 20549
Tel: (202) 551-2379 (Carney)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MORDECHAI HAIM FERDER, AND SIMBA IL HOLDINGS LLC,<br><br>Defendants, and<br><br>MORDECHAI HAIM FERDER and EDIT FINTZI FERDER, in their capacities as Trustees of the HAIM FAMILY TRUST DATED 2/24/2009, EDIT FINTZI FERDER, in her capacity as Trustee of the TF 2021 IRREVOCABLE TRUST DATED 8/30/2021, AND MORDECHAI HAIM FERDER, in his capacity as Trustee of the RF 2021 IRREVOCABLE TRUST DATED 8/30/2021,<br><br>Relief Defendants. | Case No. 8:26-cv-02492<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, the Securities and Exchange Commission ("SEC"), alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

2. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because certain of the acts, practices, and courses of conduct constituting the violations alleged herein occurred within the Central District of California. Ferder resided in and worked at Lugano's headquarters in this judicial district, and he took actions, entered into agreements, and made statements described in this complaint while in this judicial district. Ferder controlled Simba, and in some instances acted through it in carrying out the actions described in this complaint.

3. Defendants, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## SUMMARY

4. From 2021 to 2025, Defendants, Mordechai Ferder ("Ferder") and Simba IL Holdings LLC ("Simba"), orchestrated a massive accounting fraud centered on sham investment contracts involving diamonds that resulted in Lugano Holdings, Inc. ("Lugano") recording over a billion dollars of fictitious revenue. At the core of this scheme, Defendants deceived individuals into investing hundreds of millions of dollars in diamonds that neither Defendants nor Lugano ever owned, based on promises that Ferder would use his jewelry industry expertise to increase the diamonds' value. At Ferder's direction, Lugano then fraudulently recorded the money received from investors as revenue. In reality, Ferder never even took steps to acquire

the diamonds purportedly tied to these investments, and instead relied on Ponzi-like payments to the investors to keep the fraud going.

5. In September 2021, Compass Diversified Holdings ("CODI"), a publicly traded company that acquired other companies with the goal of improving them, purchased a majority interest in Lugano Diamonds & Jewelry Inc. (the predecessor to Lugano) from Defendants, believing that it was a successful business with significant potential. Under the terms of that 2021 transaction, Defendants received nearly $104 million and retained a 40% interest in the business, and Ferder became CEO of Lugano, which was created as a CODI subsidiary. Most of the $104 million went to Simba, an entity Ferder controlled that acted as a vehicle for his family wealth and that he used to facilitate the fraud. The rest of the purchase price went to three trusts created for his family's benefit.

6. For the next four years, Defendants caused Lugano and CODI to recognize over a billion dollars of fictitious revenue, by, among other things (1) improperly recognizing funding received in the fraudulent investment contracts as revenue rather than debt and (2) recording entirely fictitious revenue using fabricated invoices and accounting entries. Lugano's reported sales almost quadrupled after the acquisition by CODI. By the end of 2024, Lugano comprised 21% of CODI's revenue and 58% of its income, and CODI's revenue had grown by 19%.

7. Lugano's growth, however, was a mirage, and almost all of its reported revenue was a sham. To keep Defendants' scheme a secret while paying back certain financiers and investors, Ferder disguised those transactions as payments to suppliers, manipulated inventory records, and falsified documents. Ferder also misled CODI's external auditor, lied to CODI and its internal audit personnel, and misappropriated corporate assets. Ultimately, in an effort to turn his house of cards into another, even larger, payday, Ferder provided Lugano's sham financials to prospective buyers of Lugano when CODI began exploring a potential sale of Lugano in 2024.

8. As a result of Defendants' conduct, Lugano's and CODI's financial statements were materially misstated. After the fraud was uncovered in 2025, CODI restated its financials and Lugano was forced to declare bankruptcy. CODI's restatement corrected the value of Lugano's net identifiable assets at the time of the acquisition from $179 million to just $5 million and erased over 85% of the revenue that Lugano reported after the acquisition.

9. By engaging in the misconduct described in this complaint, Defendants violated antifraud, internal accounting controls, and books-and-records provisions of the federal securities laws. Specifically, Ferder and Simba violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]. Ferder also violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2–1].

10. The SEC seeks injunctive relief, civil penalties, disgorgement, and other appropriate and necessary equitable and statutory relief.

## DEFENDANTS

11. Ferder, age 55, was a resident of Corona del Mar, California, having lived in the United States beginning in at least 2005 and maintaining residences in California and Aspen, Colorado until at least 2025. On information and belief, in April 2025, while he was on vacation in Israel, Ferder learned that CODI had commenced an internal investigation related to Ferder's conduct. Ferder has remained in Israel and has not returned to the United States. Ferder maintains dual citizenship in the United States and Israel.

12. Simba is a Delaware limited liability company whose members are Ferder and his wife as trustees of the Haim Family Trust Dated 2/24/2009 ("Haim Family Trust") and the RF 2021 Irrevocable Trust Dated 8/30/2021 ("RF Trust").

Simba is headquartered in Newport Beach, California. Ferder is the Manager of Simba, and controlled Simba. Ferder and his family used Simba to manage their investments and assets. Simba regularly transferred funds to Ferder's personal bank account and made payments on the mortgages for the Ferders' family homes. Between September 2021 and October 2024, Ferder used a loan facility obtained by Simba to pay $18 million to providers of financing not recorded in Lugano's financial records, which is discussed below. After CODI began its internal investigation, Simba acquired the Ferders' home in Aspen, Colorado, on September 9, 2025, and then, on September 16, 2025, filed a voluntary petition for bankruptcy.

## RELIEF DEFENDANTS

13. The Haim Family Trust was established in California for the benefit of Ferder and his wife, Edit Fintzi Ferder. Ferder and Edit Fintzi Ferder are the Trustees of the Haim Family Trust.

14. The RF Trust was established in California for the benefit of the Ferders' daughter, Romi Ferder. Edit Fintzi Ferder is the Trustee of the RF Trust.

15. The TF 2021 Irrevocable Trust Dated 8/30/2021 ("TF Trust") was established in California for the benefit of the Ferders' son, Tom Ferder. Ferder is the Trustee of the TF Trust.

16. The three trusts are referred to herein collectively as "the Ferder Family Trusts."

## OTHER RELEVANT ENTITIES

17. Lugano is a Delaware corporation headquartered in Newport Beach, California, that designed, manufactured, and retailed high-end jewelry. The Lugano business was founded in 2004 by Ferder and his wife, Edit Ferder, and operated under the name "Lugano Diamonds & Jewelry Inc." Lugano Diamonds & Jewelry Inc., a California corporation, was acquired by CODI via Lugano, its newly formed

subsidiary, on September 3, 2021. Lugano and Lugano Diamonds & Jewelry Inc. filed a petition for bankruptcy on November 16, 2025.

18. CODI is a Delaware statutory trust. CODI's common stock is registered with the SEC pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange under the symbol "CODI."

## FACTS

### I. Background

19. CODI acquires and manages businesses in the consumer and industrial sectors, with the goal of helping those businesses grow over time.

20. On September 3, 2021, CODI acquired Lugano Diamonds & Jewelry Inc. via its newly formed subsidiary, Lugano. CODI entered into the Stock Purchase Agreement for Lugano Diamonds & Jewelry Inc. with Ferder in his individual capacity, Simba, Ferder in his capacity as trustee of the Haim Family Trust and of the TF Trust, and Edit Fintzi Ferder in her capacity as trustee of the RF Trust. In that transaction, CODI, through two newly formed subsidiaries, purchased a 60% interest in Lugano Diamonds & Jewelry Inc. in exchange for payments to the Ferders of $103.7 million — $85.9 million of which was paid to Simba, and $17.7 million of which went to the three Ferder family trusts.

21. Following the acquisition, from September 2021 through 2024, Lugano's reported sales almost quadrupled. By the end of 2024, Lugano made up 21% of CODI's reported revenue and 58% of its reported income, and CODI's revenue had grown by 19%.

### II. Defendants Engaged in a Massive Fraud to Falsely Depict Lugano as Financially Successful

#### A. Overview of the Fraud

22. To create the illusion that Lugano was a fast-growing, successful company, Ferder relied heavily on unrecorded financing, which he directed Lugano to fraudulently record as sales to customers. This sham revenue came from two

primary sources: (1) investment contracts in which Ferder (on behalf of Lugano and sometimes Simba) would offer investors outsized returns from investments in a valuable diamond that Defendants and Lugano never owned, and (2) other financing arrangements in which Ferder (on behalf of Lugano) obtained short-term financing in exchange for interest or a purported "profit share." To disguise Ponzi-like payments back to his investors and financiers, Ferder directed Lugano to fraudulently record those payments as purchases from vendors or deposits made for future purchases. Defendants knew, or were reckless in not knowing, that the investments and financing payments collected were not revenue generated by Lugano for selling diamonds and other jewelry, but in reality were liabilities owed by the company to those making the investments and financing payments.

23. As a subsidiary of a publicly traded company that filed consolidated financial statements, Lugano was required to adhere to Generally Accepted Accounting Principles ("GAAP") in its accounting. In accordance with GAAP, as Defendants knew or were reckless in not knowing, there was no basis for Lugano to recognize revenue for the fictitious transactions invented by Defendants, as there were no real customers involved, no goods or services to be transferred to those customers, and no real commitment by Lugano to provide such goods or services.

24. By signing the investment contracts and promissory notes on Lugano's behalf, and by directing the funds received from those agreements to be paid to Lugano, Defendants obligated Lugano to make payments to the investors and financiers. GAAP therefore required Lugano to record liabilities for the debts it owed to the financiers and investors, yet Lugano never recorded these liabilities on its financial statements. Defendants' fraudulent conduct resulted in Lugano failing to record liabilities arising from the investment contracts and other financing arrangements of $48 million at year-end 2022, $101 million at year-end 2023, and $170 million at year-end 2024, in addition to $27 million of accrued interest at year-end 2024.

### B. Defendants Caused Lugano to Record Fictitious Revenue from Investment Contracts

25. Ferder entered into hundreds of fraudulent contracts with investors, sometimes through Simba, in which Defendants promised an outsized return in exchange for a large, short-term investment. Typically, Ferder told the investor that he or Lugano had obtained, or planned to obtain, a particularly expensive diamond at below-market prices; that the investor could invest in a 50% share of the diamond (with Lugano taking the other half); that Ferder and Lugano would convert the diamond into jewelry using Ferder's expertise at creating bespoke high-end jewelry, would market the jewelry, and would find a buyer (again using his unique access to wealthy clients); and that the investor would receive a return of as much as 20-40%, based on the profits from the sale of the diamond, within about six months. Sometimes, Ferder entered into contracts for the same diamond with multiple different investors without telling them about the other contracts. In certain instances, multiple investors jointly participated in these investment contracts. Investors themselves did not need to do anything to generate the promised returns on these transactions other than send their money; their profits were derived from, and dependent upon, Ferder's efforts.

26. Ferder personally negotiated these contracts and signed the contracts individually, on behalf of Lugano, or on behalf of Simba. Ferder directed Lugano to record these funds as revenue, even though he knew, or was reckless in not knowing, these transactions were not revenue and did not satisfy the GAAP requirements for the recording of revenue. In some instances, Lugano recorded revenue even in excess of the funds received from the investors, with the excess being recorded as accounts receivable. Ferder concealed the existence of these contracts and details about their terms from CODI and Lugano.

27. In other instances, Ferder directed Lugano to use these funds to reduce existing accounts receivable in Lugano's financial records, such as when greater

scrutiny was being applied by CODI to Lugano's receivables. Ferder did not ensure that Lugano recorded liabilities in connection with these investment contracts. Instead, Ferder deceptively concealed the true nature of this funding by mischaracterizing these investors as customers and their investments as payments for purchases of jewelry.

### C. Defendants Defrauded CODI at the Time CODI Acquired Lugano in 2021

28. Defendants defrauded CODI at the time of the 2021 acquisition of Lugano Diamonds & Jewelry Inc. (the predecessor to Lugano) by concealing both that funds received from investment contracts: (1) were improperly recorded as revenue and (2) created significant liabilities, as Lugano Diamonds & Jewelry Inc. was obligated under the contracts to repay the principal plus guaranteed returns. In other words, Defendants falsely represented to CODI that funds which Lugano Diamonds & Jewelry Inc. received from investors and was required to pay back (plus the guaranteed return) represented legitimate retail sales of jewelry to real paying customers.

29. Prior to the acquisition, Ferder had engaged in at least 28 undisclosed investment contracts, for proceeds of over $16 million. Proceeds from these deals were improperly recorded in Lugano Diamonds & Jewelry Inc.'s books and records, which were shared with CODI to induce the acquisition, as customer sales and accounts receivable payments. As discussed in detail below, when the scheme unraveled, CODI determined as part of its 2025 restatement that, as of the acquisition date, Lugano Diamonds & Jewelry Inc.'s liabilities were understated by over $20 million due to the investment contracts.

30. Additionally, prior to the acquisition, Ferder also entered into other financing arrangements (discussed in more detail below, as these arrangements ramped up after the acquisition) on behalf of Lugano Diamonds & Jewelry Inc., in

which he signed promissory notes agreeing to pay either an interest rate or a 20 to 30 percent “profit share” in exchange for short-term financing.

31. The 2025 restatement revealed that Lugano Diamonds & Jewelry Inc.’s liabilities were understated by over $14 million at the time of the 2021 acquisition due to these financing arrangements.

32. Defendants did not tell CODI about the existence and nature of these investment contracts and financing arrangements at the time of acquisition.

33. Instead, Defendants made false and misleading statements to CODI in connection with the sale of Lugano Diamonds & Jewelry Inc. to CODI.

34. Specifically, in the September 3, 2021 Stock Purchase Agreement between Defendants and CODI, Defendants falsely represented that the Lugano Diamonds & Jewelry Inc. financial statements provided in connection with the acquisition were correct and complete, prepared in accordance with GAAP, and fairly presented the company’s financial position and results of operations.

35. Ferder had ultimate authority over Lugano Diamonds & Jewelry Inc.’s financial statements and therefore was also the maker of the false statements in the financial statements provided to CODI in conjunction with the acquisition.

36. Ferder also made false and misleading statements to CODI in connection with the due diligence preceding the acquisition. For example, as part of the due diligence, Ferder caused CODI to be provided with information about Lugano Diamonds & Jewelry Inc.’s top customers. However, when CODI asked during due diligence about the company’s apparent top customer that year, Ferder did not disclose that the purported revenue from that customer included investment contract funding, as opposed to simply retail purchases. Instead, Ferder misled CODI into believing that the funds Lugano Diamonds & Jewelry Inc. received from this investment contract were simply the proceeds from selling jewelry to a top customer, and not a debt that the company had to eventually repay plus a guaranteed return.

37. Similarly, when specifically asked about two sources of alternative financing during a pre-acquisition call with CODI, Ferder misled CODI. These financing sources, Financier B and Financier C, provided substantial financing to Lugano Diamonds & Jewelry Inc. in 2020 and 2021 and were identified as significant customers during due diligence. When asked about Financier B's "big, one-time purchases in current YTD 2021" and Financier C's drop in purchases in 2021 compared to 2020 and 2019, Ferder misled CODI by failing to disclose that Lugano Diamonds & Jewelry Inc. primarily received financing from those individuals rather than revenue from actual retail sales.

38. Defendants knew or were reckless in not knowing that their representations about Lugano Diamonds & Jewelry Inc.'s financial condition were false and that the financial statements provided to CODI vastly understated the company's liabilities and significantly overstated its revenue.

39. Defendants obtained nearly $104 million from CODI based on these representations. Simba alone received $85.9 million in that transaction based on its misrepresentations.

40. Information about the true financial condition of Lugano Diamonds & Jewelry Inc. was material to CODI's decision to acquire the company because a reasonable investor would have wanted to know that Lugano's financial records were misstated.

### D. Defendants Continued Entering into Investment Contracts After CODI's Acquisition of Lugano and Made Material Misrepresentations to Investors

41. From the acquisition date through Q1 2025, Ferder, sometimes through Simba, entered into at least 221 investment contracts for which Lugano falsely recorded revenue of at least $428 million (based on $205 million of cash received). CODI determined as part of the 2025 restatement that as of the end of 2024 Lugano

had failed to record $105 million of liabilities in connection with these investment contracts.

42. Ferder, sometimes through Simba, also defrauded the investors in the investment contracts by making material misrepresentations. Ferder stated that he or Lugano had already acquired the diamonds that were the subject of the investment contracts, or that he planned to acquire the diamonds, and would do so at a below-market price. He stated that he or Lugano would store and insure the diamonds. He stated that he would create a piece of jewelry from the diamond or otherwise try to increase the value of the investment. He stated that he would find a buyer, or that he had already found a buyer. He stated that the returns to the investors were based on profits from those sales. At times, Ferder even concurrently entered into investment deals with different investors for the same purported diamond, without disclosing that fact to the investors.

43. In fact, as Defendants knew or were reckless in not knowing, Ferder and Lugano did not actually buy or sell the investment contract diamonds, nor did they take any steps to increase their value. The payments they made to investors, sometimes through Simba, were not based on the actual sale of diamonds described in the investment contracts, but instead were Ponzi-like payments that often involved funds obtained from subsequent investors or financiers.

44. Ferder's misrepresentations (sometimes through deals involving Simba) about acquiring or planning to acquire actual diamonds and using his efforts to increase their value, were material to investors because they created the false impression that the investments were backed by valuable precious stones. These misrepresentations also created the false impression that the payments investors received, which included a share of "profit," were the result of the actual sale of diamond jewelry, as opposed to simply reflecting Ponzi-like payments.

45. It would have been material to investors' decisions to invest with Ferder to know that instead of using their funds to acquire and/or enhance the value

of diamonds, he was using them to make Ponzi-like payments to earlier investors in his scheme or to reduce outstanding accounts receivables on Lugano's books.

46. Defendants obtained hundreds of millions of dollars based on these misrepresentations to investors in investment contracts.

**E. An Illustrative Example of a Fraudulent Investment Contract**

47. Although the machinations described below might appear complicated, at its core, Defendants used misrepresentations and phony paperwork to induce investors to send millions of dollars to invest in diamonds that Lugano never owned to be sold to customers that had never agreed to purchase those diamonds from Lugano.

48. One illustrative example of Defendant's scheme involves Co-Investor 1, who entered into thirteen investment contracts with Lugano after the acquisition by CODI. Co-Investor 1 appeared to be Lugano's sixth largest purported customer as a result of those deals, with total reported revenue of $30 million during that period. Yet, only $3 million of the total was valid revenue; the remaining revenue was fictitious, did not meet the revenue recognition requirements of GAAP, and was reversed in the restatement.

49. In a February 24, 2024 email to Co-Investor 1, Ferder identified a supplier from whom he had purportedly purchased a diamond ring. In that email, Ferder also identified the customer to whom he had purportedly already sold the ring and stated that the customer had wired a deposit. Ferder said that if Co-Investor 1 contributed a "$1.08M Investment" (i.e., half the purported purchase price of the diamond) they would receive a "$1.41M return" (i.e., a 31% return) about four months later.

50. On February 24, Ferder also sent Co-Investor 1 the purported invoice and wire confirmation for Lugano's $2.16 million purchase of a 24.88 carat diamond ring, a purported invoice for the customer's purchase of the ring for $2.82 million and deposit on it, and a report describing a 24.88 carat diamond. The next day, Co-

Investor 1 agreed to the investment contract. The final investment contract, which Ferder signed, reflected the fictitious information that Ferder had provided to the investor. On February 26, Co-Investor 1 wired the $1.08 million investment to Lugano. Ferder then knowingly caused Lugano to improperly record the cash receipt as a reduction of accounts receivable in the general ledger instead of as a liability.

51. Not only was the investment payment improperly recorded as reduction of accounts receivable, the entire deal that was described to Co-Investor 1 was fake. The supplier and customer invoices (including the noted deposit) and the report describing a 24.88 carat diamond that Ferder provided the investor were fabricated. Indeed, Lugano's bank records and general ledger reflect much smaller payments and receipts from the purported supplier and customer, unrelated to the transaction described to Co-Investor 1. Ferder deceptively modified the documentation for actual transactions with the supplier and customer to support the fictitious transactions recorded by Lugano.

52. A few days later, on March 4, 2024, Ferder offered another investment contract to Co-Investor 1 based on a purported Lugano diamond purchase and expected sale, stating the diamond was "bought from" a named supplier for $2.4 million, and "sold to" a named customer for $3.1 million. Ferder also claimed that Lugano had received a "Deposit via wire" from that customer. Ferder's email included a fabricated invoice from the supplier, fabricated evidence of Lugano's wire to the supplier, a fabricated invoice from Lugano to the customer, and fabricated evidence of the deposit from the customer.

53. This series of transactions that Ferder described to Co-Investor 1 also did not take place. Lugano's bank records, general ledger, and inventory records do not reflect the purchase from the named vendor, the sale to the specified customer, or the deposit by the customer on or about the respective dates. Instead, Lugano's bank records and general ledger once again only reflect smaller unrelated payments and receipts from the identified supplier and customer. Once more, Ferder deceptively

modified the original transaction documentation with different amounts and provided them to Co-Investor 1.

54. On March 6, 2024, Co-Investor 1 agreed to the investment contract, sent Ferder the signed agreement, and wired $1.2 million to Lugano. The final agreement, which Ferder signed, reflected the fictitious information that Ferder had provided to the investor. Lugano then improperly recorded the funds as a reduction of accounts receivable in the general ledger instead of as a liability.

55. Ferder knew, or was reckless in not knowing, that the statements he made to Co-Investor 1 about the purported transactions underlying these investment contracts were false.

56. It would have been material to Co-Investor 1 to know that the diamond sales they were investing millions of dollars in were completely fake and that Ferder's statements about the purported deals were false.

57. Ferder obtained millions of dollars from Co-Investor 1 based on these misrepresentations.

### F. Defendants Caused Fictitious Revenue to be Recorded from Other Financing Arrangements

58. As described above, Ferder also entered into other financing arrangements prior to CODI's acquisition of Lugano, which he failed to disclose to CODI. He continued to engage in this conduct following the acquisition. From 2021 to 2025, and at Ferder's direction, Lugano inappropriately recorded revenue that Ferder obtained through these financing arrangements. These arrangements typically involved Ferder agreeing to pay the financier an interest rate or "profit share" amount in exchange for short-term financing. Sometimes, these were documented through promissory notes; in other instances, these arrangements were made through more informal communications.

59. Ferder communicated to Lugano employees that these transactions were legitimate sales, even though these transactions did not satisfy the GAAP

requirements for the recording of revenue. Sometimes, Ferder directed Lugano to record revenue in excess of the amount received from the financing transaction, with the excess being recorded as accounts receivable. In other instances, Ferder directed Lugano to use these funds to reduce existing accounts receivable. Ferder did not ensure that Lugano recorded liabilities in connection with these arrangements. Instead, Ferder concealed the truth about this funding by mischaracterizing these financiers as customers and their funding as payments for purchases of jewelry. Ferder knew, or was reckless in not knowing, that these funds should not have been recorded as revenue.

60. After the acquisition by CODI, Ferder entered into at least 171 financing arrangements that generated proceeds to Lugano of nearly $135 million. He caused Lugano to falsely record an even higher number — over $180 million — as revenue attributable to the sources of this financing by booking unpaid receivables associated with purported customers. The reported revenue attributable to these financing sources was almost entirely fictitious and was restated. Over $170 million of the false revenue was attributable to three financiers who were falsely listed in Lugano's records after the acquisition as its three largest customers. As of December 31, 2024, Lugano improperly failed to record liabilities of $46 million related to the alternative financing arrangements.

### G. Lugano Recognized Significant Revenue From Three Financiers Who Were Falsely Identified in Lugano's Financial Records as Large Customers

#### 1. Ferder Caused Lugano to Falsely Record Financier A's Contributions to Lugano as Revenue

61. Financier A includes an individual and three associated entities that provided funding to Lugano. Ferder disguised the financing received from Financier A as customer activity, including sales, customer deposits, and accounts receivable payments. That purported customer activity was entirely fabricated, and, instead,

Ferder caused Lugano to incur significant debt to Financier A. Approximately $68 million was recorded as revenue from Financier A, making it Lugano's largest purported customer. None of this revenue met the revenue recognition requirements of GAAP, and the entire amount was reversed in CODI's 2025 restatement, described in detail below. In fact, Financier A never purchased any diamonds or jewelry from Lugano related to the recorded transactions. Instead, these financing arrangements included promissory notes that Ferder (on behalf of Lugano) entered into with Financier A, agreeing to provide Financier A a "profit share" that amounted to as much as 35% of the amount borrowed. Ferder identified certain diamonds as collateral for those obligations, but Lugano never owned or held the diamonds identified. Ferder also used the RF 2021 Trust to pay certain funds owed to Financier A.

**2. Ferder Caused Lugano to Falsely Record Financier B's Contributions to Lugano as Revenue**

62. Financier B was another individual who provided financing to Lugano that Ferder falsely disguised as customer activity, including as sales, customer deposits, and accounts receivable payments. That purported customer activity was almost entirely fabricated and, instead, Ferder caused Lugano to incur significant debt to Financier B.

63. Lugano received approximately $45 million from Financier B, which was disguised in the general ledger as payments on fictitious outstanding accounts receivable balances for Financier B and other unrelated purported customers. Ferder also caused Lugano to recognize revenue associated with Financier B that had no relationship to the funds received from Financier B. In total, approximately $53 million was recorded as revenue from Financier B, making it Lugano's second-largest purported customer. Only $233,800 of this amount was linked to actual sales and met the revenue recognition requirements of GAAP, and the remainder was reversed in the restatement.

64. Ferder also disguised approximately $25 million in repayments to Financier B (of amounts owed under the financing arrangements) by causing Lugano to falsely identify Financier B in Lugano's records as a supplier, and recording those payments as purchases from Financier B or deposits on future inventory deliveries.

**3. Ferder Caused Lugano to Falsely Record Financier C's Contributions to Lugano as Revenue**

65. Financier C was another individual who provided financing to Lugano, which Ferder falsely disguised as customer activity, including sales, customer deposits, and accounts receivable payments. That purported customer activity was almost entirely fabricated and, instead, Ferder caused Lugano to incur significant debt to Financier C.

66. Lugano received approximately $31 million in financing from Financier C, which Ferder caused to be disguised in the general ledger as payments on fictitious outstanding accounts receivable balances for Financier C. In addition, Ferder caused Lugano to recognize revenue associated with Financier C that had no relationship to the funds received from Financier C. In total, approximately $50 million was recorded as revenue from Financier C, making it Lugano's third-largest purported customer. Only $180,000 of this amount was associated with actual sales and met the revenue recognition requirements of GAAP, and the remainder was reversed in the restatement. Ferder also concealed repayments to Financier C both by causing Lugano to identify Financier C in Lugano's records as a supplier, and by causing Lugano to record other payments to Financier C as payments to different entities.

**H. Ferder Funneled Payments to Investors and Financiers Through Actual Lugano Vendors and Companies Disguised as Vendors**

67. To conceal the Ponzi-like payments back to investors and financiers, Ferder engaged in fictitious transactions in which Lugano purported to be buying or making deposits on inventory that was never actually received. At times, Ferder

arranged with a legitimate Lugano vendor for that vendor to receive funds from Lugano, which the vendor then transmitted (less a commission) to the investor or financier. In other instances, Ferder directed Lugano employees to treat a third-party entity as a Lugano vendor, even though Lugano never made legitimate purchases of inventory from that entity. Finally, Ferder sometimes directed Lugano employees to make payments to a purported vendor while providing the bank account number for an account held by an unrelated investor or financier. Simba sometimes made direct payments to Lugano vendors as part of these sham transactions.

68. Ferder concealed the fraudulent nature of these transactions by characterizing some of them as deposits on inventory or by recording nonexistent inventory on Lugano's balance sheet. CODI determined in its restatement that Lugano's inventory was overstated by $59 million at the time of the acquisition, $96 million in 2022, $200 million in 2023, and $391 million in 2024. Ferder also misled CODI and its auditors when they inquired about purported vendors and attempted to confirm the existence of inventory that Lugano had purportedly received.

**1. Ferder Used Vendor X to Funnel Payments to Investors and Financiers**

69. In many transactions with Vendor X, which also supplied products to Lugano, Ferder instructed the vendor to pay third parties. Ferder did so to funnel payments to investors and financiers through the vendor. Ferder then arranged for Lugano to reimburse the vendor for these payments, adding a commission. Ferder also directed the vendor on what details to include in the invoices to document the phony transactions.

70. For instance, on July 6, 2023, Ferder told Vendor X, "I will wire you $1,717,000 and you will wire to my client right away $1,700,000." Lugano's general ledger reflected a payment to Vendor X on July 6, 2023 for $1,717,000 as a "purchase deposit" on future inventory, without any indication that the payment was

actually intended for a third party such as Ferder's "client." On July 7, Vendor X wired $1.7 million to Financier B. Vendor X retained the $17,000 difference.

71. On July 11, Vendor X asked Ferder to provide "details on the stone for the wire we did last week? So I can add to my inventory and invoice you." Ferder directed Vendor X to "Just write vivid yellow ring 22ct," and then elaborated, "Ascher" [cut] and "22.05 ct." On July 12, Vendor X emailed an invoice to Ferder for $1.717 million for a yellow 22.05 carat ring. This fictitious purchase deposit was used to disguise a repayment of financing owed by Lugano to Financier B.

72. On July 31, 2023, Vendor X asked Ferder to confirm that Vendor X was "paying [Co-Investor 2] 1.811m? And then we'd be receiving 1% on top from you?" Ferder confirmed this, and on August 1, Lugano wired Vendor X $1.829 million. On August 2, Vendor X wired Co-Investor 2 $1.811 million and retained the $18,110 difference. Lugano's general ledger reflected the payment to Vendor X as a purchase deposit. This fictitious purchase deposit was used to disguise a repayment of financing by Lugano to Co-Investor 2.

73. The extent of the fictitious scheme involving Vendor X was such that on June 28, 2024, after completing a wire for Ferder, Vendor X's principal messaged Ferder that he would be out of the country until July 15 and would not be able to do any more wires until he returned. Upon his return on July 15, Vendor X emailed an invoice to Ferder for $1.84 million for a diamond purchase. The same day, Lugano wired $1.84 million to Vendor X, which immediately wired $1.82 million to Financier A. Lugano's general ledger reflected the payment to Vendor X as a purchase deposit. This fictitious purchase deposit was used to disguise a repayment of financing owed by Lugano to Financier A.

74. During the relevant period, Lugano made total net payments of at least $51.6 million to Vendor X, of which Vendor X subsequently transferred at least $47.5 million to third parties associated with Lugano. Of the $47.5 million, $24 million was transferred to Financier A and $14 million to Financier B.

75. Ferder routed these payments through Vendor X solely to hide the true nature of the payments and the fraudulent scheme.

**2. Ferder Pretended that Vendor Y Was a Diamond Supplier in Order to Funnel Investor and Financier Payments Through It**

76. Ferder also mischaracterized Vendor Y, a set of three commonly controlled entities, as a Lugano supplier, even though Lugano did not transact any legitimate business with those entities. Despite the absence of a bona fide business relationship, Lugano paid approximately $96 million to Vendor Y.

77. Ferder also falsely characterized Vendor Y as a significant customer of Lugano, when in fact Vendor Y did not make any actual purchases from Lugano. Lugano recorded $27 million in revenue from Vendor Y, all of which was reversed in the restatement, and also used cash received from Vendor Y to reduce the fictitious accounts receivable associated with Vendor Y or unrelated customers. Of that amount, Lugano actually received only $17 million, none of which met the revenue recognition requirements of GAAP.

78. Prior to the acquisition, Vendor Y appeared to be one of Lugano's top ten vendors, and the second largest vendor for the period October 1, 2020 through April 30, 2021, making up 11% of Lugano's total purchases. Ferder told CODI that Vendor Y was a diamond supplier that acquired a variety of diamonds, and that sometimes Lugano sold Vendor Y inventory that it no longer wanted. In fact, Vendor Y was not in the business of buying and selling diamonds.

79. Ferder regularly used Vendor Y to make payments to investment contract investors and financiers that would appear in Lugano's books and records as payments to a supplier. For example, on August 17, 2023, Lugano sent a wire transfer for $4.825 million to Vendor Y. The same day, Vendor Y sent a wire transfer for $4.8 million to an investment contract investor. On January 4, 2024, Lugano made a $3.1 million wire transfer to Vendor Y. The same day, Vendor Y wired $3.1 million to an

entity owned by an investment contract investor. Lugano sent nearly $21 million to Financier A and nearly $9 million to Financier B after the acquisition by funneling the payments through Vendor Y. Another investor who repeatedly participated in Ferder's investment contracts received at least five payments in 2024 and 2025 via Vendor Y, which he understood to be payments by Lugano under the investment contracts. These payments totaled over $4.8 million.

80. Ferder knew that Vendor Y was making payments to investors on behalf of Lugano, and manipulated CODI into transferring funds to Lugano by misrepresenting the role of Vendor Y. On July 22, 2024, Ferder and another Lugano executive asked a CODI executive to "accelerate funding to Lugano to support [a] transaction" to "acquire a diamond for $5.6M" from Vendor Y, which Lugano would then turn into a ring and resell for $8.8 million. CODI approved this transaction, and transferred $5.6 million to Lugano to fund this purchase.

81. Upon receipt of the $5.6 million from CODI on July 23, 2024, Ferder caused Lugano to immediately wire $4.75 million to Vendor Y. Vendor Y then paid $4,661,750 to four co-investors on July 23 and 24, 2024. Lugano did not actually buy a diamond for $5.6 million from Vendor Y or turn the diamond into a ring sold for $8.8 million, but Ferder caused Lugano's general ledger and inventory records to record these fictitious inventory purchase and sale transactions on July 22, 2024. Lugano recorded a sale of an $8.8 million diamond ring to Customer T and an associated receivable, but that sale was fictitious and was reversed in the restatement.

82. Ferder knew, or was reckless in not knowing, that these purchase and sales transactions were fake.

**3. Ferder Engaged in Yet Another Financing Transaction to Cover His Tracks from the Previous Ones**

83. In February and March 2025, after receiving questions from CODI about Lugano's large receivables balances, Ferder engaged in two transactions to eliminate the $8.8 million fictitious receivable associated with Customer T. First, he

transferred $2.5 million from Relief Defendant TF Trust to Lugano. Second, Ferder obtained funds from Co-Investor 1.

84. Although Ferder's prior transactions with Co-Investor 1 had been investment contracts, Co-Investor 1 required Ferder to provide additional collateral in this transaction. This additional requirement by Co-Investor 1 followed situations in which Co-Investor 1 had experienced delays in receiving payments from Ferder on amounts owed under the investment contracts. Thus, on March 11, 2025, Co-Investor 1 obtained a mortgage on Ferder's home in Aspen, Colorado. Co-Investor 1 then sent $6.4 million to Lugano, $6.3 million of which Lugano recorded as the remaining payment on Customer T's receivable. When asked by Lugano financial personnel for additional information about that transaction, Ferder lied about its terms, concealed the role of Co-Investor 1, and fabricated an email from Customer T confirming its terms. Ferder claimed that he had made a short-term loan to Customer T to enable the customer to pay off the receivable, even though Customer T in fact had no involvement in the fictitious initial purchase or the effort to pay off the receivable. Ferder knew, or was reckless in not knowing, that the information he provided about the transaction was false.

**I. Lugano's Liquidity Issues and Reliance on Fictitious Revenue**

85. The investment contracts and additional financing provided a way for Ferder to keep Lugano afloat despite significant liquidity issues, while also contributing to those issues. Lugano routinely lacked sufficient cash to pay its operating expenses, in part because the company was making Ponzi-like payments to its undisclosed investors and financiers. Ferder found short-term fixes to this problem by obtaining additional funding from investment contract investors or financiers, or by delaying repayments to them. After the acquisition, Lugano obtained access to a significant line of credit from CODI, so Ferder also used those funds to maintain the company's liquidity, borrowing $584 million during the subsequent four years.

86. Leading up to the acquisition, Lugano relied heavily on outside funding to maintain liquidity. For instance, in May 2021, Lugano defaulted on an outstanding bank loan. On June 30, before obtaining $5 million in funding that allowed Lugano to cure the default, a senior Lugano financial employee wrote that the company's bank account had only "about 3k in cash" and "we made it by the hair on our chinny chin chin!"

87. Even after the acquisition, despite having access to a substantial line of credit from CODI, Lugano routinely lacked sufficient cash to pay its operating expenses. On September 25, 2024, for example, Lugano only had around $102,000 of cash on hand, and it had a negative balance when accounting for outstanding checks. That day and the next, at Ferder's instigation, Lugano collected over $9 million, relying in large part on funding from investment contract investors and financiers. On September 30, 2024, after paying $5.1 million in interest on its line of credit, Lugano had only $300,000 on hand. The next day, Lugano drew $20 million from its revolver loan with CODI, but then still missed its regular October 2024 interest payment to CODI. Lugano's liquidity issues continued in the subsequent months, despite borrowing another $15 million from CODI. These issues continued to fuel Lugano's need for outside financing.

### J. Ferder's Misappropriation of Lugano's Corporate Assets

88. Ferder misappropriated Lugano corporate assets. Ferder directed Lugano to make payments to Vendor Y, which were promptly followed by payments from Vendor Y to Ferder. Vendor Y made at least 57 payments to Ferder's personal bank account, totaling over $6.8 million. Each of these payments was made shortly after Lugano had paid funds to Vendor Y. Ferder also caused Lugano to make four separate payments to Simba, totaling $1.6 million, that were disguised in Lugano's accounting records as deposits for inventory purchased from another vendor.

89. Ferder also caused Lugano to pay for artwork for his home and to improperly record the artwork as Lugano jewelry inventory. In June 2022 and

October 2022, Ferder caused Lugano to pay for two separate pieces of artwork that were shipped to Ferder's residences. Ferder then caused Lugano to improperly record the artwork as Lugano jewelry inventory purchases and sent Lugano accountants fictitious documentation that inaccurately identified the artwork sellers as Lugano suppliers. For the June 2022 purchase, Ferder used a fictitious supplier name to further mask the true nature of the transaction.

90. Almost immediately after recording the two fake jewelry inventory purchases, Ferder caused Lugano to record fictitious sales of those items through fabricated transactions with a financier and an investor. Those transactions, in turn, improperly inflated Lugano's revenue, and were ultimately reversed in the restatement. Ferder further profited from this transaction by causing a subsequent sales tax refund from the June 2022 artwork seller to be paid to Ferder's personal bank account, even though Lugano had paid the sales tax.

91. Ferder knew, or was reckless in not knowing, that it was improper for him to misappropriate Lugano's assets and to record fake transactions in Lugano's books to disguise his misappropriation.

### K. Ferder's Deceptive Conduct and Efforts to Undermine Lugano's Controls

92. Ferder engaged in deceptive conduct to conceal his scheme from investors, potential purchasers of Lugano, CODI, and Lugano's and CODI's auditors. In quarterly representations and in response to questions raised by Lugano, CODI, and auditor personnel, Ferder repeatedly lied, fabricated documents, and took other deceptive actions.

93. Ferder made false and misleading statements in quarterly representation letters to CODI's outside auditor, including that: Lugano's financial statements had been prepared in conformity with GAAP; Lugano had provided all information relevant to the preparation of the financial statements; there were no material transactions that had not been properly recorded in Lugano's accounting

records; Lugano had disclosed all side agreements and other arrangements; Ferder had no knowledge of fraud affecting Lugano; all of Lugano's revenue transactions were valid sales transactions; Lugano had title to all inventory; all of Lugano's receivables were collectible; and the purchase deposits represented down payments in relation to future inventory.

94. To reduce scrutiny of the investment contracts, Ferder directed that Lugano staff refer to them as "diamond sales" rather than "investment deals."

95. When Lugano's controller learned about an investment contract and raised concerns, Ferder falsely told him that the contract was a "one-off" and that the transaction would not actually be executed after all. Ferder understood at that time that this contract was still in force and that he had already engaged in dozens of investment contracts. When CODI asked about the same transaction months later (and just a week after Lugano had paid back the investor), Ferder falsely claimed that investment contracts involved "no contract" and instead related to a diamond that was "owned by the client."

96. In response to CODI's auditor identifying a significant deficiency in Lugano's internal controls arising from Ferder's access to initiate, authorize, and conduct sales transactions and inventory purchases using Lugano's inventory control system, Ferder and Lugano informed the auditor that Ferder's access had been restricted. In fact, however, Ferder continued to have extensive access to Lugano's systems that allowed him to create invoices, adjust pricing, and initiate and approve inventory transactions, while resisting efforts to address this issue.

97. Ferder impeded inventory observation visits by CODI's outside auditor. He insisted that all such visits be prescheduled, that the auditor provide advance notice of all items they wished to inspect, and that he be in attendance. He then arranged for the inventory records to reflect that certain items had been loaned out to other vendors or shipped to other Lugano locations at the time of the visit, to prevent the auditor from learning that those items did not actually exist. For instance,

during one inventory observation by the auditor, 37% of items selected by the auditor were not made available for their observation, largely because Lugano claimed that the items had been loaned out to other vendors at the time of the observation. Before another inventory observation, Ferder instructed employees to notify his wife of "any discrepancy" found during the visit, emphasizing that "the auditors are NOT your friends." After the visit, Ferder complained to CODI about the intrusiveness of the auditor's work.

98. Sometimes, after receiving a list of items that CODI's outside auditor wanted to inspect, Ferder directed Lugano employees to create transactions involving certain items listed by the auditor and ship empty packages (or packages containing just jewelry cleaner) to corroborate those transactions. Ferder also took loose gemstones from a stash of items that he personally controlled, attached inventory identifiers to them, and showed those to the auditor's gemologist for inspection.

99. When CODI's external and internal auditors tried to confirm the validity of revenue for transactions initiated by Ferder, Ferder resisted and delayed those efforts. Lugano's financial reporting personnel and CODI's internal auditors eventually learned that Ferder appeared to be fabricating documentation of customer approval of transactions, including by falsifying customer signatures.

100. Ferder knew, or was reckless in not knowing, that his actions deceived auditors and hid the true nature of Lugano's finances from CODI and others.

**L. Ferder Caused Misstatements of CODI's Financial Statements**

101. Following CODI's acquisition and until the fraud was uncovered in 2025, Ferder regularly and repeatedly misled CODI about Lugano's performance. In quarterly meetings of Lugano's board of directors, which were attended by CODI executives (including but not limited to the CODI executives who sat on Lugano's board), Ferder participated in discussions about Lugano's financial performance, without disclosing that its purported growth in revenue and earnings was a sham.

102. Lugano's false financial statements, which were incorporated into CODI's consolidated financial statements, were reviewed and approved by Ferder.

103. Ferder was aware of false information about Lugano contained in CODI's periodic filings, including its Forms 10-K and 10-Q, and its quarterly earnings calls.

104. Ferder also presented false information about Lugano's financial performance directly to CODI investors and analysts.

105. Ferder's actions resulted in false information being transmitted to the investing public through annual, quarterly, and current reports at a time when CODI's common stock was trading publicly. Moreover, CODI offered and sold securities through registration statements that included this false information by incorporating the above-described SEC filings.

106. By the end of 2024, Lugano made up more than half of CODI's reported income. Therefore, information about Lugano's true financial performance was material to CODI investors. Not only were Ferder's misstatements about Lugano's financial performance false and misleading, they were materially so.

107. Simba obtained money (for Ferder's benefit) by selling CODI stock on April 10, 2025.

### M. Ferder Provided False Information to Potential Purchasers of Lugano

108. In 2023, Lugano and CODI began an effort to sell Lugano, targeting a valuation of $3 billion, which could theoretically yield over $1 billion to Ferder and his family. Ferder was personally involved in preparing and reviewing the false financial statements and disclosures shared with investors and the firms involved with finding potential buyers for Lugano—materials that touted Lugano's strong business model and sales growth.

109. He also directed that Lugano's controller, who had raised concerns about various transactions and business practices at Lugano, not be allowed to

participate in discussions with the firm conducting financial due diligence in connection with this potential sale. Ferder was personally involved in discussions with potential purchasers, including without CODI's knowledge.

**III. The Scheme Unravels, Ferder Resigns, and Lugano Collapses**

110. On or about April 2, 2025, CODI personnel spoke with Ferder to raise questions about investment contracts that Ferder had entered into on behalf of Lugano. At the time, Ferder was on a family trip abroad and was scheduled to return to the United States on or around April 15, 2025. On information and belief, Ferder never returned to the United States.

111. On April 10, 2025, Simba sold all of its holdings in CODI stock, at a price of $16.38 per share, realizing proceeds of approximately $75,000.

112. In a Form 8-K dated May 7, 2025, CODI disclosed that in April 2025 its Audit Committee had "commenced an internal investigation into the financing, accounting, and inventory practices of Lugano" regarding "certain unrecorded financing arrangements and irregularities identified in sales, cost of sales, inventory, and accounts receivable recorded by Lugano." The filing stated that CODI's financial statements for fiscal year 2024 "should no longer be relied upon due to the materiality of the preliminary findings of the investigation," and that CODI expected to restate its financials. CODI also disclosed that Ferder had resigned as CEO of Lugano. The next day, CODI's stock price declined by over 62%.

113. On June 18, 2025, CODI issued another Form 8-K stating that its financial statements for fiscal years 2022 and 2023 should no longer be relied upon.

114. On November 16, 2025, Lugano filed for Chapter 11 bankruptcy.

115. On December 4, 2025, CODI previewed the results of its financial restatement during an investor conference call. The next day, its stock price fell by over 22%.

116. On December 8, 2025, CODI filed a Form 10-K/A restating its financial statements for fiscal years 2022, 2023, and 2024. CODI also identified

material misstatements in Lugano's financial statements prepared before CODI's acquisition of Lugano in 2021, which affected CODI's purchase price allocation for Lugano and CODI's results of operations for 2021.

117. The restatement indicated that Lugano Diamonds & Jewelry Inc., the business that CODI had paid Defendants over $100 million for, was essentially worthless, and that Lugano's purported growth after the acquisition was a sham.

118. After analyzing Lugano's financials as part of the restatement, CODI corrected the value of Lugano's acquired net identifiable assets from $179 million to just $5 million (reducing the value by approximately 97%).

119. For the period from Q3 2021 (the time of the Lugano acquisition) through Q4 2024 (the last quarter for which CODI publicly reported financials before beginning its internal investigation), Lugano's total revenue decreased because of the restatement by $892 million (or 86%), from $1 billion to $142 million. When including the financial statements that Lugano first recorded for Q1 2025 before the internal investigation began, Lugano recorded over $1 billion of fictitious revenue. From 2022 through 2024, Lugano's operating income decreased by $503 million (or 149%), from a $336 million profit to a $166 million loss.

120. For 2024, CODI restated its operating income from $230 million to a $15 million loss, its net revenue from $2.2 billion to $1.8 billion, and its inventory value from $962 million to $571 million. For 2023, CODI restated its operating income from $85 million to a $69 million loss, its net revenue from $2 billion to $1.7 billion, and its inventory value from $723 million to $522 million. For 2022, CODI restated its operating income from $148 million to $44 million, its net revenue from $1.9 billion to $1.8 billion, and its inventory value from $658 million to $562 million. CODI also restated Lugano's 2024 net revenue from $471 million to $60 million, and Lugano's 2024 liabilities from $717 million to $994 million. In total, CODI's total revenue for 2022 through 2024 was restated from $6.1 billion to $5.2 billion, and its

operating income for that period was reduced by $503 million (or 149%), from a $463 million income to a $40 million loss.

121. CODI stated in its restatement Form 10-K/A that it had determined that Ferder had “deliberately engaged in fraudulent activity by, among other things, entering into off-balance sheet financing arrangements with third parties in violation of Company policies and directives and the terms of the Company’s intercompany credit agreement with Lugano, misrepresenting the existence and valuation of inventory, and causing the recording of fictitious sales.”

122. CODI further found that Ferder had “sought to circumvent financial controls (including, among other things, through the creation and use of false documents and manipulation of Lugano employees who exhibited a lack of due care); ignored directives from the Company and the Audit Committee to implement additional controls; and actively recorded or edited, or caused the recording or editing of, false entries in Lugano’s accounting and financial records.” CODI concluded that there were misstatements in its financial statements for Fiscal Years 2022, 2023, and 2024, as well as “in Lugano’s financial statements prior to the Company’s acquisition of Lugano on September 3, 2021 that affected the Company’s original purchase price allocation for Lugano and the Company’s results of operations in the fiscal year ended December 31, 2021.”

## IV. Defendants Sent More than $17 Million in Proceeds from Defendants’ Fraudulent Scheme to Relief Defendants

123. As part of the fraudulent 2021 sale of Lugano Diamonds & Jewelry Inc. to CODI, Defendants directed funds to the Relief Defendants.

124. Ferder and his wife, Edit Fintzi Ferder, are the trustees of the Haim Family Trust. This trust received $11,827,040 in proceeds from 2021 sale of Lugano Diamonds & Jewelry Inc. to CODI.

125. Edit Fintzi Ferder is the trustee of the RF Trust. The trust was created days before the 2021 sale of Lugano Diamonds & Jewelry Inc to CODI, and received $2,956,760 in that transaction.

126. Ferder is the trustee of the TF Trust. The trust was created days before the 2021 sale of Lugano Diamonds & Jewelry Inc to CODI, and also received $2,956,760 in that transaction.

**FIRST CLAIM FOR RELIEF**

**(Violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder)**

**(Against Defendants Ferder and Simba)**

127. Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

128. By engaging in the conduct described above, Ferder and Simba, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of any facility of any national securities exchange, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

129. Among other things, as more fully set forth in paragraphs 28 to 40, Defendants made materially false and misleading statements to CODI in connection with the 2021 acquisition of Lugano Diamonds & Jewelry Inc. Additionally, as more fully set forth in paragraphs 41 to 109, Ferder, in some instances through Simba: entered into hundreds of fraudulent investment contracts with investors, promising outsized returns in exchange for large, short-term investments in purported diamonds, provided investors with materially false information regarding the same, and directed Lugano to record the funds received as revenue; engaged in additional financing

arrangements, obtaining funds from financiers that at Ferder's direction Lugano inappropriately recorded as revenue, and concealed the truth about this funding by mischaracterizing the financiers as customers; made material misstatements and omissions to CODI (including for transmission to CODI's public investors), CODI's external auditors, and CODI's internal auditors, including in quarterly representation letters; provided false information to potential purchasers of Lugano, touting Lugano's strong business model and sales growth; misled CODI about Lugano's performance, concealing that its purported growth in revenue and earnings was a sham; and misappropriated Lugano's corporate assets, including by directing Lugano to make payments to Vendor Y, which were then followed by payments from Vendor Y to Ferder, and by directing Lugano to make payments to Simba that were disguised in Lugano's accounting records as payments to another vendor.

130. While engaged in the conduct described above, Ferder and Simba acted knowingly or recklessly.

131. By engaging in the conduct described above, Ferder and Simba violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

**(Violations of Securities Act Section 17(a))**

**(Against Defendants Ferder and Simba)**

132. Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

133. By engaging in the conduct described above, Ferder and Simba, in the offer or sale of a security, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state

a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

134. Among other things, as more fully set forth in paragraphs 28 to 40, Defendants made material false statements to CODI in connection with the 2021 acquisition of Lugano Diamonds & Jewelry Inc. Additionally, as more fully set forth in paragraphs 41 to 109, Ferder, sometimes through Simba: entered into hundreds of fraudulent investment contracts with investors, promising outsized returns in exchange for large, short-term investments in purported diamonds, and directed Lugano to record the funds received as revenue; engaged in alternative financing arrangements, obtaining funds from financiers that at Ferder's direction Lugano inappropriately recorded as revenue, and concealed the truth about this funding by mischaracterizing the financiers as customers; made material misstatements and omissions to CODI (including for transmission to CODI's public investors), CODI's external auditors, and CODI's internal auditors, including in quarterly representation letters; provided false information to potential purchasers of Lugano, touting Lugano's strong business model and sales growth; misled CODI about Lugano's performance, concealing that its purported growth in revenue and earnings was a sham; and misappropriated Lugano's corporate assets, including by directing Lugano to make payments to Vendor Y, which were then followed by payments by Vendor Y to Ferder, and by directing Lugano to make payments to Simba that were disguised in Lugano's accounting records as payments to another vendor.

135. While engaged in the conduct described above, Ferder and Simba acted knowingly, recklessly, or negligently.

136. By engaging in the conduct described above, Ferder and Simba violated, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**

**(Violations of Exchange Act Rule 13b2-1)**

**(Against Defendant Ferder)**

137. Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

138. By engaging in the conduct described above, Ferder directly or indirectly falsified, or caused the falsification of, CODI's books, records, and accounts required by Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

139. Among other things, Ferder caused fictitious revenue to be recorded by: directing Lugano personnel to record funds received from investment contract investors and alternative financing transactions as revenue, without accurately describing the terms of the transactions or ensuring GAAP requirements were satisfied; directing Lugano personnel to record revenue in excess of the amount received from financing transactions, with the excess recorded as fictitious accounts receivable, and ultimately, by causing Lugano to record over $1 billion of fictitious revenue from Q3 2021 through Q1 2025, which flowed into CODI's consolidated financial statements.

140. Ferder also caused Lugano inventory records to be falsified by: recording or directing Lugano employees to record nonexistent inventory on Lugano's balance sheet, ultimately causing inventory to be overstated by hundreds of millions of dollars by 2024; recording or directing Lugano employees to record sales of certain listed items and ship empty packages or packages containing only jewelry cleaner to corroborate the fictitious sales to evade CODI's audit inspections; taking loose gemstones from a personal stash, attaching inventory identifiers to them, and presenting them to the auditor's gemologist for inspection, to mislead CODI auditors; and arranging for inventory records to falsely reflect that certain items had been loaned out to vendors or shipped to other Lugano locations during CODI auditor

observation visits. The falsification of these inventory records flowed into CODI's consolidated financial statements.

141. Additionally, Ferder caused Lugano to record millions of dollars in payments to investors and financiers as fictitious inventory purchase deposits paid to legitimate vendors. As part of that effort, he caused Lugano to make payments to a vendor doing no legitimate business with Lugano and mischaracterize those as payments to a supplier, while causing the vendor to route those funds to investors and financiers, in exchange for a fee.

142. Ferder further caused Lugano to mischaracterize financiers as customers, recording their financing payments as customer sales, deposits, and accounts receivable payments.

143. Ferder's actions resulted in Lugano's liabilities being understated by $170 million as of year-end 2024 by failing to ensure that Lugano recorded liabilities for obligations owed to investment contract investors and alternative financiers.

144. Ferder also fabricated supplier invoices, wire confirmations, customer purchase invoices, and deposit records to support fictitious transactions.

145. Furthermore, Ferder signed quarterly representation letters to CODI's outside auditors containing material misstatements, including that Lugano's financial statements were prepared in conformity with GAAP, all revenue transactions were valid sales, all receivables were collectible, purchase deposits represented down payments for future inventory, and there were no undisclosed side agreements or arrangements.

146. The above actions resulted in inaccuracies in Lugano's books and records, which then ultimately flowed into CODI's consolidated financial statements.

147. By engaging in the conduct described above, Ferder violated, and unless restrained and enjoined will again violate, Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

**FOURTH CLAIM FOR RELIEF**

**(Violations of Exchange Act Section 13(b)(5))**

**(Against Defendant Ferder)**

148. Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

149. By engaging in the conduct described above, Ferder circumvented or failed to implement a system of internal accounting controls or falsified a book, record, or account of CODI, including by permitting CODI to recognize revenue in violation of GAAP.

150. Among other things, Ferder: directed Lugano personnel to record funds received from investment contract investors as revenue, without accurately describing the terms of the transactions or ensuring GAAP requirements were satisfied; directed Lugano to record funds received from alternative financing arrangements as revenue, even though those transactions did not satisfy GAAP revenue recognition requirements; directed Lugano to record revenue in excess of amounts received from financing transactions, with the excess recorded as fictitious accounts receivable, and caused Lugano to record over $1 billion of fictitious revenue from Q3 2021 through Q1 2025, which flowed into CODI's consolidated financial statements. He also caused Lugano's liabilities to be understated by $170 million as of year-end 2024, which also caused CODI's consolidated financial statements to be false.

151. Ferder also caused fictitious inventory to be recorded on Lugano's balance sheet, resulting in inventory overstatements ultimately reaching $391 million by 2024, which likewise caused CODI's consolidated financial statements to be inaccurate.

152. Ferder circumvented CODI internal accounting controls by among other things: resisting and delaying auditor efforts to confirm the validity of revenue transactions; falsely informing CODI auditors that his access to Lugano's accounting system had been restricted when he in fact retained extensive access to create

invoices, adjust pricing, and initiate and approve inventory transactions; and impeding inventory inspections and falsifying inventory and transaction records to circumvent transaction confirmation procedures, inventory confirmation procedures, and other audit procedures.

153. Ferder also signed quarterly representation letters to CODI's outside auditors containing material misstatements, including that Lugano's financial statements were prepared in conformity with GAAP, all revenue transactions were valid sales, all receivables were collectible, purchase deposits represented down payments for future inventory, and there were no undisclosed side agreements or arrangements.

154. While engaging in the conduct described above, Ferder acted knowingly.

155. By engaging in the conduct described above, Ferder violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

**FIFTH CLAIM FOR RELIEF**

**(Unjust Enrichment)**

**(Against All Relief Defendants)**

156. Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

157. The Ferder Family Trusts received unjust enrichment in the form of proceeds from the fraudulent sale of Lugano Diamonds & Jewelry Inc. to CODI, and continued to commingle funds with Ferder and Simba after that sale.

158. Subsequent to the sale of Lugano Diamonds & Jewelry to CODI, millions of dollars were transferred among the Ferder Family Trusts, Simba, and Ferder's personal accounts, indicating that the trusts' assets were commingled with those of Ferder and Simba.

159. Moreover, the RF Trust (along with Simba) made some repayments to the investment contract participants and outside financiers, demonstrating that Ferder used the trust to transmit funds used in the frauds described above.

160. Ferder and his wife, Edit Fintzi Ferder, are the trustees of the Haim Family Trust. This trust received $11,827,040 in the 2021 sale of Lugano Diamonds & Jewelry Inc. to CODI. The Haim Family Trust had no legitimate claim to the funds it received. The Haim Family Trust obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore was unjustly enriched.

161. Edit Fintzi Ferder is the trustee of the RF Trust. The trust was created days before the 2021 sale of Lugano Diamonds & Jewelry Inc to CODI, and received $2,956,760 in that transaction. The RF Trust had no legitimate claim to the funds it received. The RF Trust obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore was unjustly enriched.

162. Ferder is the trustee of the TF Trust. The trust was created days before the 2021 sale of Lugano Diamonds & Jewelry Inc to CODI, and also received $2,956,760 in that transaction. The TF Trust had no legitimate claim to the funds it received. The TF Trust obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore was unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a final judgment:

A. in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C.

§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

B. in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Ferder, his agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2–1];

C. ordering Defendants and Relief Defendants to disgorge all funds received from the illegal conduct, together with prejudgment interest thereon, under Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78(u)(d)(3), 78(u)(d)(5), 78u(d)(7)], and ordering that disgorgement and prejudgment interest to be owed on a joint and several basis as to: (1) Ferder, Simba, and the Haim Family Trust; (2) Ferder, Simba, and the RF Trust; and, (3) Ferder, Simba, and the TF Trust;

D. ordering Ferder and Simba to pay civil monetary penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] and Securities Act Section 20(d) [15 U.S.C. § 77t(d)];

E. ordering, pursuant to Sections 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], that Ferder is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

F. imposing a conduct-based injunction pursuant to Section 21(d)(1) and (d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(1) and (d)(5)], permanently restraining and enjoining Ferder from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

G. retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

H. granting such other and further relief as the Court may deem equitable and proper.

**JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands a jury in this matter for all claims so triable.

Respectfully submitted,

Dated: August 31, 2026

/s/Christopher J. Carney

Christopher J. Carney (*pro hac vice* pending)
Nishchay Maskay (*pro hac vice* pending)
Daniel O. Blau (Local Counsel)

Attorneys for Plaintiff
Securities and Exchange Commission